UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF ILLINOIS

TABITHA TRIPP, GARY SHEPHERD, CHARLIE HOWE,        )
FELICIA HOLLY, VERA HOLLY, and RENEE COOK,         )
                                                    )
        Plaintiffs,                                 )
                                                    )
v.                                                  )        No. 14-cv-890-JPG-PMF
                                                    )
JESSE R. SMART, sued in his official capacities as the    )
Chairman of the Illinois State Board of Elections and     )
Member of the State Officers Electoral Board,             )
CHARLES W. SCHOLZ, sued in his official capacities        )
as Vice-Chairman of the Illinois State Board of Elections )
and Member of the State Officers Electoral Board,         )
BRYAN A. SCHNEIDER, BETTY J. COFFRIN,                     )
HAROLD D. BYERS, CASSANDRA B. WATSON,                     )
WILLIAM M. McGUFFAGE, and ERNEST L. GOWEN,                )
sued in their official capacities as Members of the Illinois )
State Board of Elections and Members of the               )
State Officers Electoral Board, and                       )
RUPERT T. BORGSMILLER, sued in his official capacity      )
as the Executive Director, Illinois State Board of Elections, )
                                                    )
        Defendants.                                 )

## COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTION

Now come the plaintiffs–Tabitha Tripp and Gary Shepherd ("Plaintiff Candidates"),

Charlie Howe, Felicia Holly, Vera Holly, and Renee Cook–by and through their attorney,

Vito A. Mastrangelo, and for their complaint at law against the Defendants–Jesse R. Smart,

in his official capacities as the Chairman of the Illinois State Board of Elections ("ISBE") and

a Member of the State Officers Electoral Board (ISOEB); Charles W. Scholz, in his official

capacities as the Vice-Chairman of the ISBE and a Member of the ISOEB; Bryan A.

Schneider, Betty J. Coffrin, Harold D. Byers, Cassandra B. Watson, William M. McGuffage,

and Ernest L. Gowen, in their official capacities as Members of the ISBE and Members of the ISOEB; and Rupert T. Borgsmiller, in his official capacity as the Executive Director of the ISBE (collectively "Defendants")–state as follows.

## JURISDICTION & VENUE

1.      This Complaint is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the First and Fourteenth Amendments to the United States Constitution.  Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4) and the aforementioned statutory and constitutional provisions.  Venue in this Court exists and is proper pursuant to 28 U.S.C. § 1391(b)(1) and 1391(b)(2), in that one or more Defendants reside within this District and a substantial part of the events and omissions giving rise to the Plaintiffs' claims occurred within the Southern District of Illinois.

## PARTIES

2.      The Illinois Green Party ("ILGP") is a member organization of the Green Party of the United States.  Although the ILGP is not currently recognized as an "established party" under the Illinois Election Code, 10 ILCS 5/1-1, *et seq.*, the ILGP has internal procedures for selecting candidates to petition for nomination as Green Party candidates on the General Election ballot.

3.      Plaintiff Tabitha Tripp is a member of the Illinois Green Party.  She resides within Illinois's 118th Representative District, in Anna in Union County, Illinois.  Pursuant to the ILGP's internal procedures, Plaintiff Tripp was selected to be the Green Party's candidate for Illinois's 118th Representative District in the General Election to be held on November 4, 2014.

4.      Plaintiff Gary Shepherd is a member of the Illinois Green Party.  He resides within Illinois's 115th Representative District, in Carbondale in Jackson County, Illinois.

Pursuant to the ILGP's internal procedures, Plaintiff Shepherd was selected to be the Green Party's candidate for Illinois's 115th Representative District in the General Election to be held on November 4, 2014.

5.    Plaintiff Charlie Howe is a duly registered voter and a member of the ILGP residing in Jackson County, Illinois, who seeks the opportunity to vote for Plaintiff Tripp in the November 4, 2014, General Election, and he was a signatory on the petition circulated on behalf of Plaintiff Tripp for nomination for 118th District Representative.

6.    Plaintiffs Felicia Vero and Holly Vero are duly registered voters and members of the ILGP residing in Pope County, Illinois, who seek the opportunity to vote for Plaintiff Tripp in the November 4, 2014, General Election, and they were signatories on the petition circulated on behalf of Plaintiff Tripp for nomination for 118th District Representative.

7.    Plaintiff Renee Cook is a duly registered voter and member of the ILGP residing in Jackson County, Illinois, who seeks the opportunity to vote for Plaintiff Shepherd in the November 4, 2014, General Election, and she was a signatory on the petition circulated on behalf of Plaintiff Shepherd for nomination for 115th District Representative.

8.    Defendant Jesse R. Smart is an appointed member of the ISBE, a state agency, and its Chairman, in which capacity he acts under color of state law to administer and enforce the provisions of Illinois's Election Code, pursuant to Sections 1A-6 and 1A-8, 10 ILCS 5/1A-6, 1A-8, and other provisions of the Election Code.

9.    Defendant Charles W. Scholz, is an appointed member of the ISBE, a state agency, and its Vice-Chairman, in which capacity he acts under color of state law to administer and enforce the provisions of the Election Code, pursuant to Sections 1A-6 and 1A-8, 10 ILCS 5/1A-6, 1A-8, and other provisions of the Election Code.

10.    Defendants Bryan A. Schneider, Betty J. Coffrin, Harold D. Byers, Cassandra

B. Watson, William F. McGuffage, and Ernest L. Gowen are each currently appointed members of the ISBE, in which capacity each acts under color of state law to administer and enforce the provisions of the Election Code, pursuant to 10 ILCS 5/1A-6, 10 ILCS 5/1A-8 and other provisions of the Election Code.

11.   Defendants Smart, Scholz, Schneider, Coffrin, Byers, Watson, McGuffage, and Gowen together meet and perform the functions of the ISBE (see Ill. Const. 1970, Art. III, § 5), which maintains offices in Springfield and Chicago.

12.   Defendant Rupert T. Borgsmiller is the Executive Director of the ISBE, in which capacity he acts under color of state law to administer, enforce, and execute the provisions of the Election Code, pursuant to Section 1A-9, 10 ILCS 5/1A-9, and other provisions of the Election Code.

13.   When an objection to nomination papers is filed pursuant to Section 10-8 of the Election Code, 10 ILCS 5/10-8, Defendants Smart, Scholz, Schneider, Coffrin, Byers, Watson, McGuffage, and Gowen then constitute and meet as the ISOEB, pursuant to Section 10-9, 10 ILCS 5/10-9. The ISOEB convenes its meetings simultaneously at two locations–Springfield and Chicago, via audio and video conferencing equipment.

14.   Pursuant to Section 10-9(1) of the Election Code, 10 ILCS 5/10-9(1), the ISOEB is the electoral board designated to hear and pass upon objections to the nominations of candidates for State office and Congressional office.

FACTUAL ALLEGATIONS

15.   The Election Code recognizes two categories of political parties in Illinois. As described in Sections 7-2, 10-1, and 10-2 of the Election Code, 10 ILCS 5/7-2, 10-1, 5/10-2, political parties that received more than 5% of the vote in the State, or in a political subdivision of the State, in the election immediately prior to the election in question are

4

"declared" or recognized as "established" political parties in the State, or in that political subdivision.

16.    Pursuant to Article 7 of the Election Code, established parties have their candidates for partisan public office selected via a Primary Election, and in other respects, also, established parties are treated differently under the Election Code than other political parties.  10 ILCS 5/7-1 *et seq.*, 10-1 *et seq.*

17.    Section 10-2 of the Election Code categorizes other political parties, regardless of their history, as "new" political parties, 10 ILCS 5/10-2, and those parties then must proceed under Article 10 of the Election Code to have their candidates placed on the General Election ballot.

18.    The ILGP was founded in 1999 and was an established statewide political party in Illinois from 2007 to 2010.

19.    However, under the provisions of Section 10-2 of the Election Code, the ILGP is currently categorized as a "new" political party with respect to statewide offices and all other electoral districts except two Congressional Districts, and the ILGP must follow the petitioning process set forth in Article 10 in order to place any other candidates on the ballot for the November 4, 2014, General Election.

20.    Under Article 10, a candidate for a new political party, like Plaintiff Tripp and Plaintiff Shepherd, must collect a minimum number of nominating petition signatures from Illinois registered voters, during a 90-day petition circulation period that occurs after the Primary Election.  See 10 ILCS 5/10-2, 10-4, 10-6.

21.    Section 10-2 of the Election Code defines the relevant minimum number of signatures to be "5% of the number of voters who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision

voted as a unit for the election of officers to serve its respective territorial area."  10 ILCS 5/10-2.

22.     According to the State of Illinois Candidate's Guide 2014, issued by the ISBE (as amended November 26, 2013)[1], Plaintiff Tripp, the Green Party candidate for the 118th Representative District, was required to file a minimum of 2,399 signatures.  According to the Candidate's Guide, Plaintiff Shepherd, the Green Party candidate for the 115th Representative District, was required to file a minimum of 2,407 signatures.

23.     Section 10-4 of the Election Code requires that all signatures on the candidate's nominating petition sheets must be collected during the "90 days preceding the last day for the filing of the petition."  10 ILCS 5/10-4.

24.     Section 10-6 of the Election Code requires that the nominating petition be filed at the ISBE's principal office (Springfield) "not more than 141 nor less than 134 days previous to the day of election."  10 ILCS 5/10-6.

25.     Specifically, under Sections 10-4 and 10-6 of the Election Code, this meant that the Plaintiff Candidates Tripp and Shepherd were required to gather signatures from Illinois registered voters during the 90-day period beginning March 25, 2014, and ending June 23, 2014.[2]

26.     On June 23, 2014, Plaintiff Tripp timely filed, at the ISBE office in Springfield, Illinois, a Statement of Candidacy as the Green Party candidate for Illinois's 118th Representative District for the General Election to be held November 4, 2014, in accordance with Section 10-5 of the Election Code, 10 ILCS 5/10-5.

---

[1] http://www.elections.il.gov/Downloads/ElectionInformation/PDF/2014CanGuide.pdf

[2] June 23, 2014, is 134 days before the 2014 General Election, which is to be held November 4, 2014.

27.   On June 23, 2014, Plaintiff Shepherd timely filed, at the ISBE office in Springfield, Illinois, a Statement of Candidacy as the Green Party candidate for Illinois's 115th Representative District for the General Election to be held November 4, 2014, in accordance with Section 10-5 of the Election Code, 10 ILCS 5/10-5.

28.   Plaintiff Candidates' Statements of Candidacy were each accompanied by a receipt indicating that the candidate had filed a Statement of Economic Interests, as required by Section 10-5 of the Election Code, 10 ILCS 5/10-5, and by the Illinois Governmental Ethics Act, 5 ILCS 420/1-101 *et seq.*

29.   In keeping with the requirements of Section 10-2 of the Election Code, 10 ICLS 5/10-2, Plaintiff Tripp's Statement of Candidacy was also accompanied by a nominating petition containing the signatures and addresses of about 1,700 persons representing themselves to be Illinois registered voters, indicating their intentions to form a "new" political party known as the Green Party and to place Tripp's name on the ballot as the Green Party candidate for Illinois's 118th Representative District for the November 4, 2014, General Election.

30.   In keeping with the requirements of Section 10-2 of the Election Code, 10 ICLS 5/10-2, Plaintiff Shepherd's Statement of Candidacy was also accompanied by a nominating petition containing the signatures and addresses of about 1,800 persons representing themselves to be Illinois registered voters, indicating their intentions to form a "new" political party known as the Green Party and to place Shepherd's name on the ballot as the Green Party candidate for Illinois's 115th Representative District for the November 4, 2014, General Election.

31.   Under Section 10-8 of the Election Code, 10 ILCS 5/10-8, the timely filed nominating papers of candidates for public office are deemed valid if they are in apparent

conformity with the requirements of the Election Code, unless an objection is filed within five business days of the last day for filing the nominating papers.

32.   On June 30, 2014, Mike Pavelonis, of Harrisburg, Illinois, filed his Objector's Petition against the nomination of Plaintiff Tripp for Illinois's 118th Representative District, and the case was docketed as Pavelonis v. Tripp, No. 14-SOEB-GE-520.

33.   On June 30, 2014, Gerald Compton, of Carbondale, Illinois, filed his Objector's Petition against the nomination of Plaintiff Shepherd for Illinois's 115th Representative District, and the case was docketed as Compton v. Shepherd, No. 14-SOEB-GE-518.

34.   On July 10, 2014, Tripp and Shepherd each filed a Motion to Strike and Dismiss the Objector's Petition, raising constitutional challenges to the Objector's Petitions and to the ISOEB proceedings, and each Objector filed a Response.

35.   On July 28, 2014, David Herman, Hearing Examiner for the ISOEB, issued his recommendation in each case that the Green Party candidate not appear on the General Election ballot because the candidate did not meet the 5%-minimum-signature requirement and that the constitutional arguments not be considered because the Hearing Examiner and the ISOEB were without authority to consider them.

36.   The ISOEB has scheduled a hearing on August 22, 2014, to act on the Hearing Examiner's recommendations in the Tripp and Shepherd cases.[3]

37.   Meanwhile, also on June 23, 2014, the ILGP's statewide candidates filed their nominating petition at the Springfield office of the ISBE.  The ILGP's candidates are as follows: Omar N. Lopez for United States Senate, Scott Summers for Governor, Bobby J. Pritchett, Jr., for Lieutenant Governor, David F. Black for Attorney General, Sheldon

---

[3] August 22, 2014, is the date set for the ISBE's certification of the General Election ballot to the county election authorities.  http://www.elections.il.gov/CalendarEventsPage.aspx?Date=8/22/2014

Schafer for Secretary of State, Tim Curtin for Comptroller, and Julie Samuels for Treasurer. Karen Yarbrough filed a Objector's Petition, which was docketed as Yarbrough v. Summers, No. 14-SOEB-GE-516, and a hearing has been scheduled for August 22, 2014.

38.   On July 15, 2014, the ILGP, its statewide candidates, and one additional ILGP member filed a Complaint for Declaratory Judgment and Preliminary and Permanent Injunction in the United States District Court for the Northern District of Illinois, Eastern Division, which has been docketed as No. 14-cv-5398.[4]  A hearing has been scheduled for August 13, 2014, on the plaintiffs' motion for a preliminary injunction.

## COUNT I

### THE NOTARIZATION REQUIREMENT FOR PETITION CIRCULATORS VIOLATES THE U.S. CONSTITUTION'S FIRST AMENDMENT & FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE

39.   The Plaintiffs restate and incorporate each of the foregoing paragraphs as if fully stated herein.

40.   Section 10-4 of the Election Code, in describing the form of petition for nomination to be used by candidates of "new" political parties, provides, in pertinent part as follows:

"At the bottom of each sheet of such petition shall be added a circulator's statement, signed by a person 18 years of age or older who is a citizen of the United States; stating the street address or rural route number, as the case may be, as well as the county, city, village or town, and state; certifying that the signatures on that sheet of the petition were signed in his or her presence; certifying that the signatures are

---

[4] The complaint challenged the State's notarization requirement, the state slate requirement, and the record-examination procedure, *inter alia*.

genuine; and either (1) indicating the dates on which that sheet was circulated, or (2) indicating the first and last dates on which the sheet was circulated, or (3) certifying that none of the signatures on the sheet were signed more than 90 days preceding the last day for the filing of the petition; and certifying that to the best of his knowledge and belief the persons so signing were at the time of signing the petition duly registered voters under Articles 4, 5 or 6 of the Code of the political subdivision or district for which the candidate or candidates shall be nominated, and certifying that their respective residences are correctly stated therein. *Such statement shall be sworn to before some officer authorized to administer oaths in this State.*" (Emphasis added.)  10 ILCS 5/10-4.

41.   Thus, in addition to the requirement that a "new" party candidate for state legislative office gather a minimum number of signatures from registered voters in a 90-day window, Section 10-4 of the Election Code requires that each petition circulator fill out certain identifying and other information at the bottom of each sheet and also appear before a person authorized to administer oaths, known as a notary public, and sign each individual sheet in front of the notary, in order to satisfy the Election Code.

42.   In the event that an objector's petition challenges the validity of petition signatures filed by a candidate, the ISOEB has staff members compare the petition sheets to the ISBE's electronically stored voter registration records and images of signatures obtained from various election authorities throughout the State, in order to determine whether each objection should be sustained or overruled.  The ISOEB uses this process to decide the validity of each challenged signature line.

43.   Because of this verification process performed by the ISOEB, no State interest, or alternatively no compelling State interest, is served by this *a priori* notarization

requirement imposed on each circulator of a petition sheet gathered to satisfy the minimum-signature threshold imposed on "new" parties and their candidates.

44.    Illinois law provides an alternative to the notarization requirement through its Code of Civil Procedure, 735 ILCS 5/1-109, whereby an individual may "certify" to the truth of factual allegations under penalty of perjury, in lieu of a sworn statement before a person authorized to administer oaths (*i.e.*, a notary public).

45.    Given that this verification by certification under Illinois's Code of Civil Procedure has been deemed adequate for the purpose of authenticating all manner of court pleadings, there is no rational basis for the State to impose an even higher threshold of authentication on circulators gathering petition signatures from persons asserting that they are registered to vote in Illinois.

46.    While the State's interest in the notarization requirement is nonexistent or *de minimis*, the requirement places a severe burden on the Plaintiff Candidates, on other voters having an interest in seeing ILGP candidates appear on the ballot, like the other Plaintiffs in this case, and on others similarly situated.

47.    Notaries are not always available at times when circulators have an opportunity to seek their services.

48.    Even when notaries are available, financial institutions and other places of business often charge for each notarization service.

49.    This means that time and sometimes travel and other expenses will be incurred in the effort to get each sheet notarized.

50.    Circulators who gather more than a few sheets, especially, may need to make repeat trips to get their sheets notarized.

51.    While party members may themselves undertake to become notaries, that

process also entails time and expense.

52.    The notary requirement necessitates one extra significant step for every petition sheet to be filed, requiring the circulator to make physical contact with an additional person, a notary.

53.    The additional time necessary to accomplish the notarizing takes away from time that could otherwise be spent petitioning.

54.    For each of the Green Party candidates in this case, the notarization requirement prevented the filing of some petition sheets and negatively impacted the Plaintiff Candidates' ability to gather the minimum number of signatures required for by the Election Code.

55.    Although the petition signatures gathered by candidates of established parties are also subject to the same circulator notarization requirement, pursuant to Section 7-10 of the Election Code, 10 ILCS 5/7-10, the impact on the candidates of so-called "new" parties, like the ILGP and Plaintiff Candidates, is disproportionately greater, considering that an "established" party candidate is required to gather only 500 signatures from qualified primary electors of the candidate's party in order to secure a place on the primary ballot, 10 ILCS 5/7-10(a), and the State makes available the identity and addresses of the party's qualified primary electors.

56.    For the 115th Representative District, the 500 signatures required for an established party candidate to get on the 2014 Primary Election ballot represented 1.34% of the number of votes cast (1.04% of voters) in the 2012 General Election for that seat.

57.    In that 2012 General Election, only one name appeared on the ballot for 115th District Representative; 48,125 was the number of voters who voted from that District, but only 37,192 votes were cast for that lone name on the ballot.  This means that even when

an established party candidate had the ballot line for himself, only 77.28% of voters cast votes for him.

58.   In the 118th Representative District, the 500 signatures required for an established party candidate to get on the 2014 Primary Election ballot for that District represented 1.36% of the number of votes cast (1.04% of voters) in the 2012 General Election for that seat.

59.   In that 2012 General Election, only one name appeared on the ballot for 118th Representative District; 47,964 was the number of voters who voted from that District, but only 36,897 votes were cast for that lone name on the ballot.  This means that even when an established party candidate had the ballot line for himself, only 76.92% of voters cast votes for him.

60.   The signature-gathering requirement for new party legislative candidates, almost five times the number required of established parties, is magnified further by the burden of notarizing each and every sheet that is to be filed.

61.   Accordingly, the notarization requirement in Section 10-4 of the Election Code quoted above, on its face and as applied, discriminates against the Plaintiff Candidates, by imposing a disproportionate and undue burden on them in contrast to that imposed on the candidates of "established" political parties.

62.   The notarization requirement in Section 10-4 of the Election Code, on its face and as applied, also interferes with the rights of other Illinois voters, such as Plaintiffs Charlie Howe, Felicia Vero, Holly Vero, and Renee Cook, to associate to form a political party, effectively advocate for that party, and vote for the candidate or candidates of that party.

63.   The notarization requirement in Section 10-4 of the Election Code, on its face

and as applied, therefore violates the Plaintiffs' rights to Free Speech and Freedom of Association guaranteed by the First Amendment to the United States Constitution, incorporated and made applicable to the State of Illinois by operation of the Fourteenth Amendment to the United States Constitution.

64.   The notarization requirement in Section 10-4 of the Election Code, on its face and as applied, violates the Plaintiffs' right to Due Process and Equal Protection under the law, as guaranteed by the Fourteenth Amendment to the United States Constitution.

65.   Defendants and their employees have exercised and will continue to exercise their authority under color of State law to enforce the notarization provision of the Election Code quoted above, both facially and as applied to the Plaintiffs, for the November 4, 2014, General Election in such a manner as to be in violation of the First and Fourteenth Amendments to the United States Constitution.

WHEREFORE, the Plaintiffs respectfully request that this Court:

A.   Issue a declaration that the Section 10-4 notarization requirement, both facially and as applied to the Plaintiffs, is unconstitutional, being inconsistent with the First and Fourteenth Amendments to the United States Constitution;

B.   Find that the notarization requirement negatively impacted the Plaintiff Candidates' ability to gather and file the minimum number of signatures called for by the Election Code;

C.   Enter a preliminary injunction and permanent order enjoining Defendants from enforcing the Section 10-4 notarization requirement as applied to the Plaintiff Candidates and enjoining Defendants to direct that the name of Plaintiff Candidates be printed upon the November 4, 2014, General Election ballot, or in the alternative, afford the Plaintiff Candidates additional time in which to

gather petition signatures from registered voters, in compensation for the undue burden imposed by the notarization requirement;

D.  Award the Plaintiffs the reasonable costs and expenses of this action, including attorneys' fees pursuant to the Civil Rights Attorney's Fees and Awards Act of 1976, 42 U.S.C. §1988; and

D.  Award such other and further relief as this Court deems just and equitable.

## COUNT II (TRIPP)

### THE 5%-MINIMUM-SIGNATURE REQUIREMENT VIOLATES PLAINTIFF TRIPP'S RIGHTS UNDER THE U.S. CONSTITUTION'S FIRST AMENDMENT & FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE

66.  Plaintiff Tripp restates and incorporates the above paragraphs as if fully stated herein.

67.  Section 10-2 of the Election Code sets out the 5%-minimum-signature requirement for a nominating petition for a new party candidate, like Plaintiff Tripp:

"If such new political party shall be formed for any district or political subdivision less than the entire State, such petition shall be signed by qualified voters equaling in number not less than 5% of the number of voters who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area."  10 ILCS 5/10-2.

68.  The 5%-minimum-signature requirement applies to all legislative candidates, regardless of the differing natures of the various legislative districts.

69.  The 118th Representative District is a rural, geographically large district,

stretching from the southernmost counties of Illinois–Alexander, Pulaksi, and Massac–to the northern county line of Hamilton County.

70.  For Plaintiff Tripp to travel through her District by road from her home in Anna to McLeansboro, the county seat of Hamilton County, she would need to travel about 85 miles.  (Note that even this lengthy trip would not span the District entirely.)

71.  The 118th Representative District covers 2,760 square miles.  For comparison purposes, this District is the 4th largest of the 118 Districts; in contrast, 21 Representative Districts cover less than 10 square miles each (one of them is as compact as 3 square miles), and 74 other Representative Districts cover less than 100 miles each.

72.  This rural, geographically large 118th Representative District includes few population centers; it includes no full "urbanized areas" as defined by the Census Bureau.[5] The largest communities at least partly within the District are Carbondale (2010 Census population: 25,902), Harrisburg (2010 Census population: 9,017), Metropolis (2010 Census population:  6,537), Anna (2010 Census population: 4,442), Eldorado (2010 Census population: 4,122), McLeansboro (2010 Census population: 2,883), and Cairo  (2010 Census population: 2,831).

73.  However, of these seven largest population centers in the 118th Representative District, three of them have been divided by the Illinois General Assembly so that a part (or most) of each of them lies outside the 118th Representative District.  Carbondale had been been divided between the 115th and 118th Districts, Anna is divided between those two districts also, and McLeansboro is divided between the 118th and the 117th Districts.

74.  Gathering  signatures  in  this  rural,  geographically  large  District  with  few

_____

[5] The Census Bureau denominates an "urbanized area" as a population center of  50,000 people or more and an "urban cluster" as a population center of at least 2,500 but less than 50,000 people. http://www.census.gov/geo/reference/urban-rural.html, page last visited August 8, 2014.

population centers was more difficult for several reasons: (a) additional time was needed for travel between petition-gathering attempts, (b) additional time was needed to engage potential signers, and (c) events with large crowds were relatively scarce, especially during the early days of the 90-day petitioning period, during which the weather was harsher.

75.    In addition, gathering signatures in population centers divided between two Representative Districts was especially difficult for several reasons: (a) circulators and voters were confused about which district the voter lived in (see the District maps) [6] (b) additional time was necessary to determine the correct district in which the voter's residence was located, and (c) at larger events, even attendees residing in that city did not all reside in the same Representative District, thereby further reducing the pool of potential signers.

76.    Gathering signatures was made more difficult for an additional reason.  The circulators often also carried the nominating petition for the ILGP statewide candidates (double-petitioning), which resulted in the circulator spending more time per engaged potential signer and some potential signers not having time to sign Plaintiff Tripp's petition after signing the statewide petition.

77.    As a result of this rural, geographically large nature of the 118th Representative District, the General Assembly's drawing of the district boundaries through three of the seven largest population centers in the District, and all the circumstances described herein, the State has imposed a disproportionate and severe burden on Plaintiff Tripp to gather the statutory 5% minimum number of signatures for her nominating petition.

78.    From 2001 to the 2011 redistricting, Carbondale was entirely within the 115th

---

[6] See http://www.precinctmaps.com/maps/GA/House2011/115thHouse.pdf.

District.[7]

79.   From 2003 until the 2011 redistricting, the Green Party was an established party in the 115th District and offered a 115th District candidate on every General Election ballot from 2002 through 2010; in 2010 the Green Party candidate–Plaintiff Charlie Howe–received 25.57% of the vote.[8]

80.   The Green Party's 2006 and 2010 gubernatorial candidate resides in Carbondale.

81.   Under the legislative maps in effect for 2001 to 2011, the 118th District did not have its population centers divided as the District has under the 2011 redistricting.

82.   Under the current legislative maps–in effect after the 2011 redistricting, the division of population centers in other rural, geographically large Representative Districts is rare to nonexistent.

83.,  Plaintiffs believe that the 2011 redistricting was intended to disproportionately burden Green Party candidates who might seek a legislative seat from the area.

84.   The severity of the State's restrictive ballot access laws can also be demonstrated by other recent electoral history.  For the 118th Representative District, in each of the last two General Elections (2010 and 2012), only one name has appeared on the ballot (an established party candidate), thereby depriving voters of any choice of candidates for this elected position.[9]   The voters have had NO choice for the last two

---

[7] http://www.precinctmaps.com/maps/GA/House2001/HOUSE115.pdf.

[8] Vote totals can be found at the ISBE website here:
www.elections.il.gov/ElectionInformation/GetVoteTotals.aspx

[9] As shown on the ISBE's website:
http://www.elections.il.gov/ElectionInformation/VoteTotalsList.aspx?ElectionType=GE&ElectionID=33&SearchType=OfficeSearch&OfficeID=6024&QueryType=Office& (page last visited August 3, 2014).

elections.  And if the State, by the Defendant ISOEB, rejects Plaintiff Tripp's nominating petition for the 2014 General Election ballot, voters will, again, have NO choice of candidates for the 118th Representative District .[10]

85.  The foregoing facts describe the State's severe and overly burdensome restrictions on ballot access, which result in a violation of Plaintiff Tripp's constitutional rights.

WHEREFORE, Plaintiff Tripp respectfully requests that this Court:

A.    Issue a declaration that the 5%-minimum-signature requirement of the Election Code, both facially and as applied to Plaintiff Tripp, or alternatively only as applied to Plaintiff Tripp, is unconstitutional, being inconsistent with the First and Fourteenth Amendments to the United States Constitution;

B.    Enter a preliminary injunction and permanent order enjoining Defendants from enforcing the 5%-minimum-signature requirement of the Election Code as applied to Plaintiff Tripp and enjoining Defendants to direct that the name of Plaintiff Tabitha Tripp, as the Green Party candidate for Illinois's 118th Representative District, be printed upon the November 4, 2014, General Election ballot;

C.    Award the Plaintiffs the reasonable costs and expenses of this action, including attorney fees pursuant to the Civil Rights Attorney's Fees and Awards Act of 1976, 42 U.S.C. §1988; and

---

[10] As shown on the ISBE's website:
http://www.elections.il.gov/ElectionInformation/CandList.aspx?SearchType=office&ListType=RESULTS+OF+SEARCH+BY+OFFICE&ElectionID=43&ElectionType=GE&ElectionDate=11%2f4%2f2014&ElectionYear=2014&QueryType=CANDIDATE&OfficeIDSearchType=Matches&OfficeID=6888&StatusSearchType=Matches&Status=&OrderBy=ORDER+BY+OfficeBallotGroup%2c+OfficeSequence%2c+PartySequence%2cBracketID%2cvwCandidates.ID, page last visited August 3, 2014.

D.    Award such other and further relief as this Court deems just and equitable.

## COUNT III (SHEPHERD)

**THE 5%-MINIMUM-SIGNATURE REQUIREMENT VIOLATES
PLAINTIFF SHEPHERD'S RIGHTS UNDER
THE U.S. CONSTITUTION'S FIRST AMENDMENT &
FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE**

86.    Plaintiff Shepherd restates and incorporates the above paragraphs as if fully stated herein.

87.    Section 10-2 of the Election Code sets out the 5%-minimum-signature requirement for a nominating petition for a new party candidate, like Plaintiff Shepherd:

"If such new political party shall be formed for any district or political subdivision less than the entire State, such petition shall be signed by qualified voters equaling in number not less than 5% of the number of voters who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area."  10 ILCS 5/10-2.

88.    The 5%-minimum-signature requirement applies to all legislative candidates, regardless of the differing natures of the various legislative districts.

89.    The 115th Representative District is a rural, geographically large district, stretching from the southwestern corner of Union County on the Mississippi River to Jefferson County in the north.

90.    For Plaintiff Shepherd to travel through his District by road from the southwestern corner to the northeastern corner, he would need to travel about 115 miles.

91.    The 115th Representative District covers 1,705 square miles.  For comparison

purposes, this District is the 14th largest of the 118 Districts; in contrast, 21 Representative Districts cover less than 10 square miles each (one of them is as compact as 3 square miles), and 74 other Representative Districts cover less than 100 miles each.

92.   This rural, geographically large 115th Representative District includes few population centers; it includes no full "urbanized areas." [11]  The largest communities at least partly within the District are Carbondale (2010 Census population: 25,902), Mt. Vernon (2010 Census population: 15,277), Murphysboro (2010 Census population: 7,970), Du Quoin (2010 Census population: 6,109), and Anna (2010 Census population: 4,442).

93.   However, of these five largest population centers in the 115th Representative District, three of them have been divided by the Illinois General Assembly so that a part (or most) of each of them lies outside the 115th Representative District: Carbondale is divided between the 115th and 118th Districts, Du Quoin is divided between the 115th and the 116th, and Anna is divided between the 115th and the 118th.

94.   Gathering signatures in this rural, geographically large District with few population centers was more difficult for several reasons: (a) additional time was needed for travel between petition-gathering attempts, (b) additional time was needed to engage potential signers, and (c) events with large crowds were relatively scarce, especially during the early days of the 90-day petitioning period, during which the weather was harsher.

95.   In addition, gathering signatures in population centers divided between two Representative Districts was especially difficult for several reasons: (a) circulators and voters were confused about which district the voter lived in (see the District maps [12] (b) additional time was necessary to determine the correct district in which the voter's

---

[11] *See supra*, note 5.

[12] See http://www.precinctmaps.com/maps/GA/House2011/118thHouse.pdf.

residence was located, and (c) at larger events, even attendees residing in that city did not all reside in the same Representative District, thereby further reducing the pool of potential signers.

96.   Gathering signatures was made more difficult for an additional reason.  The circulators often also carried the nominating petition for the ILGP statewide candidates (double-petitioning), which resulted in the circulator spending more time per engaged potential signer and some potential signers not having time to sign Plaintiff Shepherd's petition after signing the statewide petition.

97.   As a result of this rural, geographically large nature of the 115th Representative District, the General Assembly's drawing of the district boundaries through three of the five largest population centers in the District, and the other circumstances described above, the State has imposed a disproportionate and severe burden on Plaintiff Shepherd to gather the statutory 5% minimum number of signatures for his nominating petition.

98.   From 2001 to the 2011 redistricting, Carbondale was entirely within the 115th District.[13]

99.   From 2003 until the 2011 redistricting, the Green Party was an established party in the 115th District and offered a 115th District candidate on every General Election ballot from 2002 through 2010; in 2010 the Green Party candidate–Plaintiff Charlie Howe–received 25.57% of the vote.[14]

100. The Green Party's 2006 and 2010 gubernatorial candidate resides in Carbondale.

---

[13] http://www.precinctmaps.com/maps/GA/House2001/HOUSE115.pdf.

[14] Vote totals can be found at the ISBE website here:
www.elections.il.gov/ElectionInformation/GetVoteTotals.aspx

101. Under the legislative maps in effect for 2001 to 2011, the 115th District did not have its population centers divided as the District has under the 2011 redistricting.

102. Under the current legislative maps–in effect after the 2011 redistricting, the division of population centers in other rural, geographically large Representative Districts is rare to nonexistent.

103. Plaintiffs believe that the 2011 redistricting was intended to disproportionately burden Green Party candidates who might seek a legislative seat from the area.

104. The severity of the State's restrictive ballot access laws can be demonstrated by other recent electoral history. For the 115th Representative District, in the last General Election (2012), only one name appeared on the ballot, thereby depriving voters of any choice of candidates for this elected position.[15]  The voters had NO choice.

105. The foregoing facts describe the State's severe and overly burdensome restrictions on ballot access, which result in a violation of Plaintiff Shepherd's constitutional rights.

WHEREFORE, Plaintiff Shepherd respectfully requests that this Court:

A.   Issue a declaration that the 5%-minimum-signature requirement of the Election Code, both facially and as applied to Plaintiff Shepherd, or alternatively only as applied to Plaintiff Shepherd, is unconstitutional, being inconsistent with the First and Fourteenth Amendments to the United States Constitution;

B.   Enter a preliminary injunction and permanent order enjoining Defendants from enforcing the 5%-minimum-signature requirement of the Election Code as applied to Plaintiff Shepherd and enjoining Defendants to direct that the name

---

[15] As shown on the ISBE's website:
http://www.elections.il.gov/ElectionInformation/VoteTotalsList.aspx?ElectionType=GE&ElectionID=33&SearchType=OfficeSearch&OfficeID=6024&QueryType=Office& (page last visited August 3, 2014).

of Plaintiff Gary Shepherd, as the Green Party candidate for Illinois's 115th Representative District, be printed upon the November 4, 2014, General Election ballot;

C.   Award the Plaintiff the reasonable costs and expenses of this action, including attorney fees pursuant to the Civil Rights Attorney's Fees and Awards Act of 1976, 42 U.S.C. §1988; and

D.   Award such other and further relief as this Court deems just and equitable.

## COUNT IV

### CUMULATIVELY, ILLINOIS'S BALLOT ACCESS LAWS VIOLATE THE U.S. CONSTITUTION'S FIRST AMENDMENT & FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE

106. The Plaintiffs restate and incorporate the above paragraphs as if fully stated herein.

107. The notarization requirement, the 5%-minimum-signature requirement, the 90-day signature-gathering period, and the splitting of population centers each constitutes a constitutionally impermissible barrier to their participation in the democratic process and violates their rights under the United States Constitution.

108. However, even if this Court should find that each of these complained-of requirements is permissible when individually scrutinized, this Court should still find in the Plaintiffs' favor, based on the totality of the circumstances–including double-petitioning and the lack of voter choice in recent elections–and the cumulative burden placed on the Plaintiffs by the requirements.

109. The complained-of requirements, when viewed in the totality of the circumstances, constitute a regimen or scheme imposed on the Plaintiffs by the Defendants

to unconstitutionally limit ballot access to only two established political parties, *i.e.*, the "two party system."

110. However, Defendants' obstructions notwithstanding, Illinois voters desire more, not fewer, choices on the ballot, and a majority of voters disapprove of the "two-party system."

111. The disapproval of the "two-party system" was confirmed in Illinois at the last Primary Election, on March 18, 2014, at which only 18% of registered Illinois voters declared themselves to be affiliated with the Democratic Party or the Republican Party. This was the lowest voter turnout for a Primary Election since 1960. Minutes of ISBE Meeting of April 8, 2014–Executive Director Borgsmiller presentation of canvass of official results for March 18, 2014, Primary Election.[16]

112. A voter affiliates with a political party by participating in a Primary Election and declaring himself or herself to be affiliated with one or another of the established parties by completing a ballot application for that party.

113. To illustrate, at the most recent March 18, 2014, Primary Election, voters who requested a Democratic Party ballot were deemed to be Democrats, and voters who requested a Republican Party ballot were deemed to be Republicans.

114. Accordingly, in Illinois, as of March 18, 2014, only 18% of registered voters are affiliated with the two currently established parties.

115. Accordingly, in Illinois, as of March 18, 2014, 82% of registered voters did not affiliate with either the Democratic Party or Republican Party.

116. Thus, through a phenomenon sometimes referred to as "voting with your feet,"

---

[16] http://www.elections.il.gov/Downloads/AboutTheBoard/PDF/04_18_14Minutes.pdf, page last visited August 9, 2014.

82% of voters disapprove of the two-party system and its candidates and desire to see candidates on the ballot who are not affiliated with either established party.

117. Furthermore, voters in the 115th and 118th Representative Districts are not satisfied with "one-party rule," either.  In the 2010 General Election, only one name appeared on the ballot for 115th Representative and only one name appeared for 118th Representative.  Yet in the election for each seat, only 77% of the voters cast their votes for the candidate, even though there was only the one name on the ballot.

118. The ISBE's and ISOEB's enforcement of the aforestated requirements of the Election Code, in the totality of the circumstances, impose heightened, severe, and excessive burdens upon the Plaintiffs, and their rights to Free Speech and Freedom of Association, that are not narrowly tailored and are not the least restrictive means to achieve the State's legitimate interests.

119. The ISBE's and ISOEB's enforcement of the aforestated requirements of the Election Code, in their totality and cumulatively, on their face and as applied, violate the Plaintiffs' rights of Free Speech and Freedom of Association guaranteed by the United States Constitution's First Amendment and Fourteenth Amendment Equal Protection clause.

WHEREFORE, the Plaintiffs respectfully pray that this Court:

A.   Issue a declaration that the cumulative effect of the Section 10-4 circulator notarization requirement, the 5%-minimum-signature requirement, the 90-day petitioning period, and the splitting of population centers, or any combination thereof, both facially and as applied to the Plaintiffs, is unconstitutional, being inconsistent with the First and Fourteenth Amendments to the United States Constitution;

B.   Enter a preliminary injunction and permanent order enjoining Defendants from enforcing the aforestated provisions of the Election Code as applied to the Plaintiffs, and enjoining Defendants to direct that the names of the Plaintiffs Tabitha Tripp and Gary Shepherd be printed upon the November 4, 2014, General Election ballot or, in the alternative, to afford the Plaintiff Candidates additional time in which to gather petition signatures from registered voters, in compensation for the undue burden imposed by the cumulative impact of the unconstitutional requirements;

C.   Award the Plaintiffs the reasonable costs and expenses of this action, including attorneys' fees pursuant to the Civil Rights Attorney's Fees and Awards Act of 1976, 42 U.S.C. §1988; and

D.   Award such other and further relief as this Court deems just and equitable.

RESPECTFULLY SUBMITTED,

TABITHA TRIPP, GARY SHEPHERD, CHARLIE HOWE, FELICIA HOLLY, VERA HOLLY, and RENEE COOK, PLAINTIFFS

BY:    s/ Vito A. Mastrangelo

Vito A. Mastrangelo
Attorney at Law
P.O. Box 1253
Mt. Vernon, IL 62864
618-316-9886
VitoAMastrangelo@gmail.com