IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TABITHA TRIPP, | ) |
| GARY SHEPHERD, | ) |
| FELICIA HOLLY, | ) |
| VERA HOLLY, | ) |
| RENEE COOK, | ) |
| ILL. GREEN PARTY, and | ) |
| CANDACE A. DAVIS, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) Case No. 14–cv–0890–MJR–PMF |
| JESSE R. SMART, in his official | ) |
| capacities, | ) |
| CHARLES W. SCHOLZ, in his official | ) |
| capacities, | ) |
| BRYAN A. SCHNEIDER, | ) |
| BETTY J. COFFRIN, | ) |
| HAROLD D. BYERS, | ) |
| CASSANDRA B. WATSON, | ) |
| WILLIAM M. McGUFFAGE, | ) |
| ERNEST L. GOWEN, and | ) |
| RUPERT T. BORGSMILLER, | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM & ORDER

REAGAN, District Judge:

BACKGROUND

This case presents a facial and as-applied challenge to two requirements of Illinois' Electoral Code, individually and in their combined effect. Plaintiffs Gary Shepherd and Tabitha Tripp (of Illinois 115th and 118th Representative Districts, respectively) both failed to obtain the minimum number of signatures to appear on the

upcoming November ballot as Green Party candidates. Plaintiffs dispute the constitutionality of the combined effects of (1) an Illinois law that requires "new party"[1] candidates to gather signatures from 5% of their district's eligible voters (10 ILCS 5/10-2, "the 5% minimum signature requirement"); and (2) that each sheet of signatures (containing a maximum of ten nominating petition signatures) be notarized (10 ILCS 5/10-4, "the notarization requirement"). The circulation period for placing a "new" party candidate on this year's November General Election ballot opened on March 25, 2014, and lasted 90 days.

Submitting the signatures they managed to collect, Shepherd and Tripp filed for candidacy on June 23, 2014. Neither met the 5% minimum (Shepherd submitted about 1,800 of the approximately 2,400 signatures he needed; Tripp also needed about 2,400, but submitted approximately 1,700). On July 28, 2014, the Illinois State Officers Electoral Board ("ISOEB") Hearing Examiner recommended that neither candidate appear on the upcoming November ballot. On August 22, 2014, the ISOEB held a hearing in which it adopted the Examiner's recommendation, and the General Election ballot was certified.

Plaintiffs filed this suit on August 13, 2014—almost five months after the circulation period began, and only nine days before their final ISOEB hearing (and ballot certification). On August 18, the instant Plaintiffs moved for a preliminary injunction. That motion, which ripened upon Defendants' response, is now before the Court. A companion case (filed by putative statewide Green Party candidates who

---

[1] Though the Green Party was "established" for the purposes of Illinois election law until 2010, it fell below a minimum threshold in that year's election, and is now considered "new."

2

were challenging three ballot access restrictions, including the notarization requirement) was filed in the Northern District of Illinois, where Judge John J. Tharp denied a preliminary injunction on August 21. (Docket No. 19-1; *Summers v. Smart*, --- F.Supp.2d ----, 2014 WL 4124253 (N.D. Ill., Aug. 21, 2014)). Judge Tharp's well-reasoned order weighed the proper factors for preliminary injunctive relief (*see below*), and concluded that the "extraordinary" remedy of a preliminary injunction was unwarranted, especially considering the late hour at which the Northern District plaintiffs (who filed suit over a month before the instant Plaintiffs did) sought to be placed on the ballot.

The Court (which in the meantime had denied a motion it construed as one for a temporary restraining order seeking delay in ballot certification, *see* Doc. 22) held a hearing on the matter over the course of September 2 to September 4, 2014. The Court took evidence (in the form of documents and testimony from a Green Party officer) and heard argument from the parties.[2] Plaintiffs understandably attempted to minimize the tardiness of their lawsuit and motion, and adduced facts tending to show the burden placed on local Green Party candidates by the 5% signature requirement and notarization requirement. Defendants gave their own interpretation of the effects of the requirements. Among the evidence introduced and the Court's findings of fact:

- Richard Whitney, former Green Party gubernatorial candidate and current party chairman, testified that he and Plaintiffs' counsel were the only two registered notaries in the local Green Party organization during the signature period. Whitney testified that becoming a notary involved less than $100 in costs and a minimal time commitment, and that he did not become a notary

---

[2] Any findings of fact or conclusions of law made by the Court at this preliminary stage are not binding at a future trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011).

    until about 2/3 of the way through the signature window.  There are over 4,000 active notary publics in the counties covered by the 115th and 118th districts.

- While it was unclear exactly when Tripp and Shepherd began collecting signatures (remember, the period began on March 25), it was not the first day of the period.  Though some evidence that collection did not begin until May, the Court finds signature collection began on or about April 20, 2014.

- The statutory deadline for printing ballots (so those ballots can be distributed to overseas armed forces members, among other things) is September 19, 2014.  As of the hearing, no ballots had been printed, but about half the county clerks had sent proofs to printing vendors.

- Collecting signatures has become more difficult since the most recent Illinois redistricting.  For example, new district lines bisect population centers (like Mount Vernon or Carbondale, Illinois), making it difficult for circulators and citizens at large events (like church meetings, farmers markets, sporting events, etc.) to identify precisely in which district they reside.  This leads to longer average conversations between circulators and potential petitioners, and necessarily shrinks the number of conversations a circulator can have in a given amount of time.  Plaintiffs assert there is simply "no time to pull out a map" and effectively gather signatures, especially in a setting like the 115th and 118th, where population density is not high.

- County clerks are responsible for printing the ballots.  The 115th and 118th Districts, like many, cover parts of several different counties.  For example, one county clerk may have to print several ballots, since each county may cover parts of two, three, or more Districts.

- About 30 people circulated for Plaintiffs Tripp and Shepherd (one, the other, or both of them).

Plaintiffs concede it is beyond the Court's power, at this juncture, to lower the 5% signature requirement to some other percentage, and ask instead that the Court place Shepherd and Tripp on the November ballot notwithstanding the lack of a final declaration declaring the 5% requirement and/or the notarization requirement unconstitutional.  In other words, they seek preliminary injunctive relief that is wholly congruent with the final relief they seek.

4

## LEGAL STANDARDS

### 1. *Preliminary Injunction Standard*

Speculative injuries do not justify a preliminary injunction. *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005). A preliminary injunction is an "extraordinary and drastic" remedy that "should not be granted unless the movant, by a clear showing, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

To obtain that drastic remedy, a party must meet a threshold showing that: no adequate remedy at law is available, that it will suffer irreparable harm in the absence of an injunction, and that there is *some* likelihood of success on the merits. *Ezell v. City of Chi.*, 651 F.3d 684, 694 (7th Cir. 2011) (emphasis added). Here, Defendants do not dispute that any harm would be irreparable or that legal (as opposed to equitable) remedies would be wholly insufficient to right any alleged constitutional wrongs. To clear the threshold, Plaintiffs must accordingly show only a "better than negligible" chance of success on the merits. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008).

If the movant passes the threshold, the factors are weighed against one another: a court must assess whether the balance of harms favors the movant or whether the harm to the nonmovant or the public is sufficiently weighty that the injunction should be denied. *Ezell*, 651 F.3d at 694. The equitable balancing proceeds on a sliding-scale analysis: the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the movant's favor. *Wisc. Right to Life, Inc. v. Barland*,

751 F.3d 804, 830 (7th Cir. 2014). Delay in moving for a preliminary injunction has been considered by some courts in assessing the probability of injury. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001); *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979). Whether a defendant has acted in reliance on the plaintiff's delay influences whether the delay in moving for a preliminary injunction is acceptable or not. *Ty, Inc.*, 237 F.3d at 903. Courts should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008).

The Seventh Circuit has described injunctions requiring an affirmative act by a defendant as a "mandatory" preliminary injunction. *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011); *Graham v. Med. Mut. Of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). A mandatory injunction imposes "significant burdens" on a defendant and requires careful consideration of the intrusiveness of the proposed act, as well as the difficulties that may be encountered in supervising compliance with the potential injunction. *Kartman*, 634 F.3d at 892. In the context of a mandatory injunction, the third part of the preliminary injunction test—the balance of the hardships—takes on heightened importance. *Id.* Even more care is warranted where, as here, a preliminary injunction would effectively give a plaintiff the full relief it seeks, thereby negating the need for a trial. *See W.A. Mack, Inc. v. General Motors, Inc.*, 260 F.2d 886, 890 (7th Cir. 1958) ("A preliminary injunction does not issue which gives to a plaintiff the actual advantage which would be obtained in a final decree.").

### 2. *Constitutional Standards*

As "a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Federal courts should avoid micromanagement of state regulation of elections. *Stevo v. Keith*, 546 F.3d 405, 409 (7th Cir. 2008). Nevertheless, two fundamental rights are implicated when a state restricts access to the ballot: the "right of individuals to associate for the advancement of political beliefs," and "the right of qualified voters … to cast their votes effectively." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). The courts' role in reviewing electoral regulation has been described as "limited but important." *Clingman v. Beaver*, 544 U.S. 581, 603 (2005) (O'Connor, J., concurring).

No litmus test separates valid election laws from invalid ones. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189–90 (2008). Courts must identify and evaluate the interests put forward by the State as justifications for burdens imposed by its rule, then balance the burden against the corresponding interests. *Id.* at 190; *Norman v. Reed*, 502 U.S. 279, 288–89 (1992) (calling for the demonstration of a corresponding interest weighty enough to justify an Illinois restriction on a party's access to the ballot).

A fair and effective electoral process has long been recognized as a legitimate state interest. *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). That broad, laudable goal comprises several narrower interests, among them: avoiding ballot

overcrowding and its associated confusion, *Nader v. Keith*, 385 F.3d 729, 733 (7th Cir. 2004); detecting and preventing voter fraud, *Crawford*, 553 U.S. at 191; modernizing antiquated and inefficient election procedures, *id.*; and avoiding confusion / deception / frustration of the democratic process, *Jenness v. Fortson*, 503 U.S. 431, 440–41 (1971). Further, states may condition general election ballot access by minor-party or independent candidates upon "a showing of a modicum of support." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). *See id.* ("States have an undoubted right to require candidates to make a preliminary showing of *substantial support* in order to qualify for a place on the ballot.") (internal citation and quotations omitted).

Though the great variance in state candidacy requirements renders makes it difficult to rely too heavily on precedent, several well-established guideposts should be noted. First, the Seventh Circuit has explained that the outer constitutional bounds of a signature requirement lie somewhere close to a 5% minimum gathered in a mere 24 days. *Stone v. Bd. of Election Comm'rs*, 750 F.3d 678, 685 (7th Cir. 2014) (explaining *Storer v. Brown*, 415 U.S. 724, 740 (1974)). *Accord Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 7774–75 (7th Cir. 1997) (upholding Illinois' 5% petitioning requirement). *See also Norman v. Reed*, 502 U.S. 279, 292–94 (1992).

Secondly, notarization requirements (while certainly adding another layer of paperwork to the candidacy process) are not *per se* burdensome. The Supreme Court acknowledged as much in *American Party of Texas v. White*, in which Texas law

required every signature to be notarized[3] (in a 55-day process), but no demonstration of the notary requirement's impracticability or burdensome nature was made. 415 U.S. 767, 787 (1974).

Finally, the Seventh Circuit has ruled that "creating a situation in which any remedial order would throw the state's preparations for the election into turmoil," a Green Party candidate waited too long to seek preliminary injunctive relief. *Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004). Ralph Nader had waited until June 27 to file suit seeking placement on Illinois 2004 presidential ballot, and "it would be inequitable to order preliminary relief in a suit filed so gratuitously late in the campaign season," the Court held. *Id.*

ANALYSIS

While Plaintiffs have established *some* likelihood of success on the merits, their motion fails because the public interest and balance-of-the-harms factors far outweigh that likelihood.

1. *Plaintiffs Pass the Preliminary Injunction Threshold*

A "better than negligible" chance of success on the merits suffices to pass the threshold test for preliminary relief. *Girl Scouts*, 549 F.3d at 1096.[4]  Plaintiffs clear that low hurdle. While the Supreme Court has previously held a 5% requirement near the outer bounds of constitutionality, *see Storer*, 415 U.S. at 740, it did not analyze a notarization requirement (or Plaintiffs' asserted problems with a rural, redrawn

---

[3] The Texas law incorporated a 500-signature limit, at which point the candidate for any district office was qualified. 500 notarized signatures is still far less than the number of notarizations required here: (2,400 signature times one page per signature, times one notarization per page = 240 notarizations).

[4] As a reminder, the other two prerequisites for a preliminary injunction—irreparable harm and no adequate remedy at law—are undisputed.

9

district) in that decision. Candidacy restrictions must be considered together rather than separately. *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) (citing *Nader*, 385 F.3d at 735). And the notarization requirement seems particularly ill-suited to combatting the state's asserted anti-fraud interest.

As Judge Tharp indicated, the notarization requirement—"particularly with the baffling requirement that each *sheet* of 10 signatures be separately certified and notarized even when collected by the same circulator"—seems divorced from both evidence and logic. *Summers*, 2014 WL 4124253, at *6; *id.* at n. 5. The undersigned agrees that the notary requirement seems hardly worthwhile given the lack of any investigative or enforcement value. The signing circulator simply affirms her own identity and that (up to) ten other people told her their own signatures were valid. The process does not reach the signers themselves, nor does it subject a lying circulator to any consequences. Notarizing every page stands in stark contrast to, as Plaintiffs suggest, requiring a simple declaration pursuant to 28 U.S.C. § 1746. Such a declaration does not require finding a notary, *and* subjects the declarer to perjury charges (surely a much stronger deterrent than nothing).

Unfortunately for Plaintiffs, their chances of ultimate success are undercut by legal counterarguments, murky evidence, and conclusions about Illinois' electoral scheme too speculative to support an injunction. In other words, their chance of success on the merits cannot overcome the public interest and balance-of-the-harms factors that weigh heavily on the other side of the "sliding scale."

## 2. *Balance of Equities Tips Sharply in Defendants' Favor*

Even though Plaintiffs show a "better than negligible" chance of success, that chance must still be quantified so as to be weighed against other factors. The first weakness in Plaintiffs' balancing argument comes from flaws in its legal position and murkiness in its evidence-based assertions.

As to the legal position that the notarization requirement (and challenges stemming from collecting signatures in a geographically large district) pushes the 5% signature requirement out of constitutional bounds, such an argument hinges on distinguishing this case from *Storer*. There, it is true, the Court seemed to set 5% as the outer bounds of a signature requirement for ballot access. *Storer*, **415 U.S. at 740.** Any additional restrictions (like notarizing each sheet of signatures) *could* raise constitutional concerns. *See Lee*, **385 F.3d at 736.** But *Storer* accounted for a far more onerous burden than is present here: candidates only had 24 days to collect their signatures. Here, in contrast, Plaintiffs had 90 days to collect their 5% total.

Nor are the consequences of the notarization requirement or far-flung nature of the 115th and 118th Districts clearly indicative of unworkable burdens. The Green Party drives in the two relevant districts involved only two notaries on the campaign staff (one of them did not finalize his notary qualifications until two-thirds of the way through, he testified). The record indicates that becoming a notary costs less than $100 and is not a particularly time-consuming process. Surely facing a purportedly onerous notarization requirement, a campaign with a "modicum of support" could afford to certify more than two notaries to make its circulators' tasks more efficient.

*See Nader*, 385 F.3d at 736 (in a statewide election, if plaintiff could not recruit a minimum number of support volunteers, "his electoral prospects were dismal indeed."). Further, the notary requirement has *some* investigative value. Notaries, who are required to keep their information current in an accessible, centralized database, are surely easier to find and question than volunteer circulators (whose signatures are likely far less legible than the notary's stamped information).

Plaintiffs also complain the large geographical area and unclear (due in part to recent redistricting) district boundaries contributed to slower pace of signatures, especially since citizens at public events often did not know which district they inhabited. Plaintiffs' witness testified that the discussion of just where a voter resided often took so long that several more voters—potential signatories all—would walk by during conversation (which often included reference to a map). But that kind of opportunity cost is likely *less* restrictive in a mostly-rural district than, for example, in Chicago, where closely packed districts and heavy traffic would lead to a higher percentage of "out of district" participants (and thus, relatively, many more "what-district-are-you-from" conversations) at every farmers' market, church gathering, political rally, etc.

The result holds particularly true given Plaintiffs' apparent failure to use their entire 90 days to gather signatures. *Stone v. Board of Election Commissioners* makes clear that "it is not the absolute or relative number of signatures required but whether a 'reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot.'" *Stone*, 750 F.3d at 682 (quoting *Bowe v. Bd. of Election*

*Comm'rs of City of Chi.*, 614 F.2d 1147, 1152 (7th Cir. 1980) (in turn citing *Storer*, 415 U.S. at 742)). The signature requirement there placed some burden on candidates and supporters, but left "room for reasonably diligent candidates to get on the ballot" even as it furthered state interests. *Id.* at 685. Defendants submitted unrebutted evidence that Plaintiffs did not begin collecting signatures until late April 2014—approximately a month after the 90-day signature period began. In other words, Plaintiffs squandered a third of the signature window *not* collecting signatures. As a reminder, each candidate was approximately six hundred (out of 2,400) signatures short of the 5% requirement. Wasting 33% of the signature period only to come up 25% short in no way indicates a scheme that acts as a "suffocating restriction upon the free circulation of nominating petitions." *Stone*, 750 F.3d at 684 (citing *Jenness v. Fortson*, 403 U.S. 431, 438 (1971)).

Even assuming the other public interest and balance-of-the-harms factors weighed as little as Plaintiffs' chances of ultimate success, the instant motion would still fall squarely in the crosshairs of *Nader*. There, the Seventh Circuit held that a late June challenge to Illinois' signature requirements was "gratuitously late" in the campaign season, such that preliminary injunctive relief would be inequitable. *Nader*, 385 F.3d at 736. The Court of Appeals considered the "turmoil" any preliminary remedy would necessarily create. *Id.* Judge Tharp relied heavily on *Nader* in denying injunctive relief in the Northern District, reasoning (as quoted in the undersigned's denial of "emergency relief" for Plaintiffs):

> Rather than bring a timely lawsuit to enjoin the provisions that the Plaintiffs allege to be unconstitutional in themselves and collectively …

13

> the plaintiffs waited to sue until the only possible preliminary injunctive remedy was to place them on the ballot notwithstanding the allegedly overburdensome ballot access requirements (most of which they complied with).

(Doc. 19-1, p. 16).

Here, Plaintiffs waited even longer than the *Nader* or *Summers* plaintiffs did. In the absence of any lawsuit (until August 13, 2014—when Plaintiffs sued almost seven weeks later in the election season than Nader did), the electoral process proceeded normally. Ballots in many counties have been proofed and sent to the printer, and while it was unclear from the parties' evidence whether ballots have actually been printed, it is clear that overseeing an injunction that would necessarily affect the myriad county clerks responsible for ballots in the 115th and 118th, thereby imposing "significant burdens" and broad public consequences. Such delay militates against preliminary injunctive relief. *Ty, Inc.*, 237 F.3d at 903.

Finally, a victory at this stage would effectively win the case for the Green Party by putting its candidates on the November ballot regardless of the eventual outcome. A plaintiff should not gain, via preliminary injunction, the actual advantage which would be obtained in a final decree. **W.A. Mack, Inc. v. General Motors, Inc., 260 F.2d 886, 890 (7th Cir. 1958).** The Seventh Circuit has reasoned: "It does not follow … that it would be a good thing if there were *no* barriers at all to third-party candidacies." **Nader, 385 F.3d at 732–33 (emphasis here).** A preliminary injunction here would, without the benefit of a complete discovery process—or a full, diligently-pursued

signature season by the candidates—erase all barriers between Plaintiffs and this year's ballot.[5] As Judge Tharp reasoned two weeks ago:

> [T]he plaintiffs ask this Court to short-circuit the State's election laws and regulations and simply order candidates onto the ballot in a manner that will, in effect, waive the constitutionally valid signature requirement, rather than address the allegedly unconstitutional provisions of law that the plaintiffs filed suit to overturn.

*Summers*, 2014 WL 4124253, at *10.

It may be that extensive discovery will generate a record on which Plaintiffs can show a constitutional deficiency, or on which permanent injunctive relief can be tailored. *See Stone v. Bd. of Election Comm'rs*, 643 F.3d 543, 545 (7th Cir. 2011) (in a post-election appeal of the district court's denial of a preliminary injunction, plaintiffs' appeal was moot, but they were "free to pursue their underlying suit," which targeted Chicago's signature requirements). But given the wide berth federal courts must give to state electoral processes, and the late hour at which Plaintiffs filed the instant case, such a mandatory injunction would trod too heavily upon Illinois' electoral procedures for the Court to consider such extraordinary relief.

## CONCLUSION

For the reasons explained above, Plaintiffs' Motion for Preliminary Injunction (Doc. 16) is **DENIED**. The case is assigned a CJRA Track **B**. Final Pretrial Conference

---

[5] It is worth noting that *only* Green Party candidates would benefit from what would effectively be a zero-signature requirement—an environment which, were it available to all, would presumably have other small parties slavering at the prospect of placing their candidates on the November ballot. *See Nader*, 385 F.3d at 733 ("A multiplication of parties would make our politics more ideological by reducing the influence of the median voter … [and] terminal voter confusion might ensue from having a multiplicity of … candidates on the ballot.").

will be set for 10:00 a.m. on June 26, 2015, and Trial set for a presumptive trial month of July 2015.

**IT IS SO ORDERED.**

DATE: September 10, 2014          s/ *Michael J. Reagan*
                                  MICHAEL J. REAGAN
                                  United States District Judge