## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

TABITHA TRIPP,                    )
GARY SHEPHERD,                    )
CHARLIE HOWE,                     )
FELICIA HOLLY,                    )
VERA HOLLY,                       )
RENEE COOK,                       )
ILLINOIS GREEN PARTY, and         )
CANDICE A. DAVIS,                 )
                                  )
                Plaintiffs,         )
                                  )
vs.                               )          Case No. 14-cv-0890-MJR-PMF
                                  )
JESSE R. SMART,                   )
CHARLES W. SCHOLZ,                )
BRYAN A. SCHNEIDER,               )
BETTY J. COFFRIN,                 )
HAROLD D. BYERS,                  )
CASSANDRA B. WATSON,              )
WILLIAM M. McGUFFAGE,             )
ERNEST L. GOWEN, and              )
STEVE SANDVOSS,                   )
                                  )
             Defendants.         )

## MEMORANDUM AND ORDER

**REAGAN, Chief District Judge:**

In 2014, Green Party members Tabitha Tripp and Gary Shepherd sought to appear on the upcoming Illinois General Election ballot as candidates for state representative—Tripp sought to appear as a candidate for the 118th district and Shepherd for the 115th district. At the time, the Green Party was an "unestablished" party under Illinois law, so Tripp and Shepherd needed signatures from 5% of the voters in their respective districts to get on the ballot. Like all candidates for the

1

geographically large 118th and 115th districts, Tripp and Shepherd needed to collect those signatures in 90 days, and each sheet of signatures needed to be signed by the circulator who gathered them and then each sheet had to be notarized. Tripp and Shepherd didn't collect enough signatures during the 90-day collection period, so the Illinois State Board of Elections ruled that they would not appear on the ballot.

After the Board refused Tripp and Shepherd a place on the ballot, the two candidates, alongside the Illinois Green Party and a few of the candidates' supporters, filed suit in this Court. The plaintiffs alleged that the 5% signature requirement for unestablished parties and the notarization requirement for all parties each violated the First Amendment and the Fourteenth Amendment of the United States Constitution. Failing that, the plaintiffs also claimed that the signature requirement and the notarization requirement—when taken with the 90-day time period for collecting signatures and Illinois' 2011 decision to remap the district boundaries in a manner that split up a number of the state's population centers—cumulatively burdened their ballot rights in an unconstitutional fashion. The plaintiffs wanted these ballot restrictions declared unconstitutional, and they also requested a preliminary injunction from the Court directing Illinois to list Tripp and Shepherd on the 2014 ballot. The Court denied the request for preliminary relief, and the case has since proceeded through discovery.

Tripp, Shepherd, and the other plaintiffs have now moved for summary judgment, asking the Court to declare the 5% signature requirement, the notarization requirement, and the cumulative effect of some of Illinois' election regulations as unconstitutional. Smart and the other Illinois State Board of Elections defendants, too,

2

have moved for summary judgment, maintaining that the challenged restrictions survive constitutional challenge.  For the reasons below, the defendants' motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied.

## Background

In 2014, Tabitha Tripp and Gary Shepherd decided to run as Green Party candidates for state representative for their respective districts—Tripp for the 118th district, which covers 2.808 square miles and runs from the southernmost counties of Illinois to the northern county line of Hamilton County; and Shepherd for the 115th district, which covers 1,808 square miles and stretches from the southwestern corner of Union County on the Mississippi River to the edge of Jefferson County.  At that time, the Green Party had not received 5% of the vote in the last gubernatorial election or 5% of the vote in the last elections in the 115th and 118th districts, so the Green Party qualified as an "unestablished" party for Tripp and Shepherd's purposes.  The Illinois requirements for getting on an election ballot differ slightly based on whether a party is an established party or an unestablished party:  unestablished party candidates need nominating signatures from 5% of the number of voters who vote at the next preceding regular election in their district to appear on the district's ballot, while established party candidates need far less, the thinking being that established party candidates don't need to demonstrate as much popular support given the party's showing in the last election. There are other Illinois balloting requirements but those apply to both established parties and unestablished ones—both parties have 90 days to collect signatures from voters, both parties are subject to the same district boundaries for the relevant district,

3

and both parties are required to submit signatures sheets with the circulator identified and the sheet notarized, so as to verify the circulator's identity.

Tripp and Shepherd could start collecting signatures in March 2014, and regardless of when they actually started collecting—there's some question in the record as to whether Tripp and Shepherd both started collecting signatures in April 2014 or if one of them started a bit later—their efforts seemingly got off to a disappointing start. Tripp and Shepherd maintain that things went slow because of Illinois' burdensome ballot regulations. Those regulations, according to Tripp and Shepherd, were a source of constant frustration for Tripp, Shepherd, their party, and their supporters in a number of ways. For one, Tripp and Shepherd had to obtain more signatures to get on the ballot then an established party, a requirement that stretched the Green Party's resources. Once more, to get those signatures, Tripp, Shepherd, and their circulators had to tour through large rural districts with cities that were split up in the last Illinois redistricting, meaning that they had to endure some travel-related burdens and had to routinely hassle voters about their district of residency. Making matters worse, each circulator's signature sheet had to be signed by the circulator and then notarized. To clear that hurdle, circulators had to independently obtain free or paid notary services, become notaries themselves, or attend Green Party notarization events.

By mid-June 2014, Tripp and Shepherd still didn't have the signatures they needed to make it onto their respective ballots, so then Green Party Chairman Rich Whitney sent an email to Tripp and Shepherd's supporters. His email touted his recent success in obtaining signatures for Tripp and Shepherd at a large event in Metropolis,

4

Illinois, but stressed that more needed to happen for the two to make it onto their ballots.  Whitney encouraged circulators to do some door-to-door work to obtain signatures throughout the 115th and 118th districts, and reminded all involved that the signature collection effort really was "do-able" and wasn't "that hard."  Despite Whitney's efforts, Tripp and Shepherd still fell short when the signatures were due in late June.  By the due date, Tripp needed 2,399 signatures but only had about 1,700 and Shepherd needed 2,407 signatures but only had about 1,800.  Given the shortfall, the Illinois State Board of Elections rejected each candidate's nominating papers.

Tripp, Shepherd, their party, and their supporters were convinced that Tripp and Shepherd missed their ballots not because they lacked popular support but because Illinois' ballot restrictions imposed a severe burden on their ballot access rights.  In August 2014, they filed a complaint in this Court against a number of Illinois State Board of Elections officials, seeking a preliminary injunction requiring Tripp and Shepherd to be placed on the ballot, as well as permanent injunctive relief concerning Illinois' ballot restrictions.  The collection of plaintiffs asserted that two provisions of the Illinois Election Code—the circulator notarization requirement and the 5% minimum signature requirement—violated the free speech and association clauses of the First Amendment and the equal protection clause of the Fourteenth Amendment, both as applied to unestablished parties in the 115th and 118th districts and facially to all.  They also claimed that there was a constitutional problem with the signature and notarization requirements when those requirements were considered in combination with the 90-day time period for obtaining signatures and the State of Illinois' 2011

decision to redraw many of the representative districts, including the 115th and 118th districts, in a manner that split up some of the districts' population centers.

In September 2014, the Court denied the plaintiffs' motion for a preliminary injunction, ruling that the 2014 election would go forward without Tripp and Shepherd on their respective ballots.  The case then proceeded through discovery, and at the end of that, the parties filed cross motions for summary judgment.  The Court held a hearing on those motions in July 2015 and then accepted supplemental briefing concerning a few election law cases that were decided around the time period of the hearing as well as briefing regarding the preclusive effect of any ruling in this case that was dependent on Tripp and Shepherd's purported lack of diligence—in other words, the candidates' alleged failure to start collecting signatures at the beginning of the 90-day period.  The cross motions for summary judgment are now before the Court for review.

## <u>Discussion</u>

The parties' cross motions for summary judgment are mirror images of each other—Tripp, Shepherd, their party, and their supporters maintain that some of Illinois' ballot restrictions violate the First Amendment and the Fourteenth Amendment, while Smart and the other Illinois Board of Election officials named as defendants insist that Illinois' requirements clear constitutional scrutiny.  The Court's task, when faced with cross motions like that, is to take each motion "one at a time," construing "all facts and draw[ing] all reasonable inferences in favor of the non-moving party" for each motion. *Advance Cable Co., LLC v. Cincinnati Ins. Co.*, **788 F.3d 743, 746 (7th Cir. 2015)**.  After parsing the motions, summary judgment is proper only if one of the movants shows

6

that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe,* 743 F.3d 1101, 1105 (7th Cir. 2014). If one of the movants makes that showing, summary judgment can be entered for that side; if neither makes that showing, the case must go to trial. *Continental Airlines, Inc. v. United Airlines, Inc.,* 277 F.3d 499, 511 n.7 (4th Cir. 2002).

The Court will start with Smart's motion for summary judgment, and his threshold argument that some or all of this case is moot because the 2014 election already occurred. The Court says "some or all" because it isn't entirely clear whether Smart is arguing that all of the injunctive relief requested is moot or if plaintiffs' request for relief concerning the 2014 election alone is moot. To the extent Smart is arguing that the election-related injunctive relief is moot, he is of course correct. The Court denied the plaintiffs' request for a preliminary injunction and the 2014 election went forward as scheduled, so the Court can't order Tripp and Shephard to be placed on the ballot this late in the game. That said, the rest of the case isn't moot. The plaintiffs are challenging the ballot restrictions that they claim kept Tripp and Shepherd off the ballot, and that is the kind of claim that ducks mootness even when the election has occurred—election controversies being capable of repetition yet usually evading review. *E.g., Storer v. Brown,* 415 U.S. 724, 737 n.8 (1974); *Lee v. Keith,* 463 F.3d 763, 767 (7th Cir. 2006); *Tobin for Gov. v. Ill. State Bd. of Elec.,* 268 F.3d 517, 528-29 (7th Cir. 2001).

With mootness dealt with, the Court can address the merits of Smart's motion for summary judgment. Smart begins with the plaintiffs' First Amendment as applied challenge, arguing that the 5% signature requirement, the notarization requirement, and

the bulk of Illinois' election regulations taken cumulatively don't violate the plaintiffs' First Amendment ballot access rights.  The Constitution does not in so many words confer a right to get oneself onto a ballot or to vote for the person of one's choice on a ballot, but the First Amendment, as incorporated against the states by the Fourteenth Amendment, does so implicitly by way of the speech and association clauses.  *E.g., Clingman v. Beaver***, 544 U.S. 581, 586 (2005);** *Anderson v. Celebrezze***, 460 U.S. 780, 786 (1983).**  That said, citizens aren't the only ones with ballot-related rights—the states have their own right to manage the ballot process.  *E.g., Gelb v. Bd. of Elections of City of New York***, 224 F.3d 149, 153 (2d Cir. 2000);** *Duncan v. Poythress***, 657 F.2d 691, 701-02 (5th Cir. 1981).**  Because of that grant of authority and because unregulated elections would be chaos, states may impose considerable restrictions on elections without violating the Constitution.  *Griffin v. Roupas***, 385 F.3d 1128, 1130 (7th Cir. 2004).**

Given these countervailing rights, ballot access restrictions are evaluated under a flexible standard that weighs the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden[s] imposed by its rule[s]," taking into account "the extent to which [the state's] interests make it necessary to burden the plaintiff's rights."  *Anderson***, 460 U.S. at 786.** Under this framework, the "rigorousness" of the Court's inquiry into the "propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights."  *Burdick v. Takushi***, 504 U.S. 428, 434 (1992).** A strict assessment of a state's balloting regulations isn't the default—the courts save

that level of scrutiny for balloting restrictions that impose severe burdens, *Norman v. Reed*, **502 U.S. 279, 289 (1992)**, for exposing every balloting regulation to a strict level of review would grind the state election system to a halt through federal judicial intervention.  *Crawford v. Marion Co. Election Bd.*, **472 F.3d 949, 952, 954 (7th Cir. 2007)**.  When a state's restrictions aren't so draconian—when the state laws impose only reasonable, nondiscriminatory restrictions on ballot access—the state's "important regulatory interests are generally sufficient to justify the restrictions." *Common Cause Ind. v. Individual Members of the Ind. Elec. Com'n*, **800 F.3d 913, 917 (7th Cir. 2015)**.

So the first question is whether the ballot restrictions imposed by the State of Illinois severely encumbered the plaintiffs' rights.  It bears mentioning at the outset that the two restrictions the plaintiffs individually target here have been upheld before, so Illinois isn't acting that far outside the norm in adopting them.  The first restriction individually targeted in this case—that candidates from unestablished parties gather a certain number of signatures before the candidate can appear on a ballot—is a common one, designed to make sure that ballots aren't filled to the brim with candidates who have little support from the electorate.  Illinois requires candidates from unestablished parties to submit signatures from 5% of the voters who vote at the next election in that candidate's district before the candidate can get on the ballot, and that kind of requirement has been found permissible.  *E.g., Jenness v. Fortson*, **403 U.S. 438, 442 (1971)**; *Libertarian Party of Ill. v. Rednour*, **108 F.3d 768, 775 (7th Cir. 1997)**.  The second kind of requirement—that some amount of sheets be notarized—is a bit rarer than the percentage requirement, but it too has been upheld in both the petition and

ballot contexts, owing to the need to combat fraud.  *E.g., Buckley v. Am. Const. Law Found., Inc.*, **525 U.S. 182, 196 (1999);** *Am. Party of Texas v. White*, **415 U.S. 767, 787 (1974);** *Am. Const. Law Found., Inc. v. Meyer*, **120 F.3d 1092, 1099 (10th Cir. 1997).**

While past cases are helpful in charting the landscape of election law, restrictions on balloting must be considered together rather than separately, *Nader v. Keith*, **385 F.3d 729, 735 (7th Cir. 2004)**, so it doesn't matter all that much, for the burden analysis anyway, that certain restrictions have been individually upheld before.  (That point renders precedent a bit unhelpful, as almost every case will involve slightly different ballot schemes given the variance among the fifty states' election statutes.)  The real inquiry is whether the "totality" of the state's restrictions caused a severe burden. *Green Party of Arkansas v. Martin*, **649 F.3d 675, 683 n.9 (8th Cir. 2011).**  A burden is "severe" if the restrictions, taken together, freeze out unestablished parties, as they would if they made it impossible for a reasonably diligent candidate to get on the ballot. *Stone v. Bd. of Election Comm'rs for City of Chicago*, **750 F.3d 678, 682 (7th Cir. 2014).**

Taken together, the restrictions the plaintiffs complain about here don't severely burden their ballot access rights.  Consider first Illinois' five-percent signature requirement, the 90-day period it allots to candidates to obtain signatures, and the split nature of some of Illinois' districts by virtue of its 2011 redistricting.  Tripp needed to obtain 2,399 signatures from eligible voters in her district to make it onto the ballot and Shephard needed 2,407—numbers that roughly equate to 27 signatures per day for each candidate.  That many signatures per day hasn't been read to create a severe burden in other cases, *see White*, **415 U.S. at 767 (22,000 signatures in 55 days);** *Storer*, **415 U.S. at**

10

740 (325,000 signatures in 24 days); *Stone*, 750 F.3d at 684 (12,500 signatures in 90 days); *Nader*, 385 F.3d at 736 (25,000 signatures in 90 days)**, and the Court isn't of the view that it created a severe burden here. To be sure, both Tripp and Shephard lived in spread-out districts with some cities that were split with other districts, and that kind of district makeup presents some challenges to signature collection efforts. But the kinds of challenges that come with campaigning in a rural district—namely a bit more drive time to pound the pavement and solicit signatures and some added questioning of voters concerning their district residency—are the kinds of challenges endemic to political campaigning. There are environment-specific challenges in every type of district: more rural districts, like Tripp and Shepherd's districts, involve more travel for circulators, while more compressed urban districts often involve higher costs for paid circulators and even more confusion among voters as to their residency, especially when a candidate throws a large signature event in a commercial area that will be attended by many urban residents. The burdens imposed by drive time and residency questioning here look far more like the "hard work and sacrifice" required of volunteers and candidates during an election, and not the kind of burden that "unreasonably interferes" with access to the ballot. **Schulz v. Williams**, 44 F.3d 48, 57 (2d Cir. 1994).[1] That estimation should come as no surprise to the plaintiffs—the Green Party's chairman at the time of Tripp and Shepherd's circulating efforts characterized the

---

[1] As an aside, if these types of environment-specific challenges could be thought to trigger severe burdens in the usual course, it would likely lead to different balloting requirements for different districts—disparities that could themselves cause constitutional issues. *See Dart v. Brown*, 717 F.2d 1491, 1501-02 (5th Cir. 1983).

signature process as "really not that hard," and said that he was able to collect 110 signatures for Tripp during a weekend and 40 for Shepherd over the course of 3 hours.

So if this case involved only a 5% signature requirement, a 90-day signature collection period, and the redistricting decisions for the 115th and the 118th districts, the Court would easily say that the burden wasn't severe.  The notarization requirement adds a wrinkle, though.  As the Court already said, these type of requirements have been upheld by the Supreme Court in the past, *White*, **415 U.S at 787;** *Buckley*, **525 U.S. at 196**, but the Supreme Court didn't assess the notarization requirement in either case in much depth because the parties didn't devote much time to it.  Those cases don't squarely discredit all notarization challenges—there is, after all, no "litmus" test for determining whether the burdens imposed by a law are severe, *Stone*, **750 F.3d at 681**— so it stands to reason that more draconian notarization requirements could cause a severe burden, either on their own or in combination with other state regulations.  The First Circuit held as much in *Perez-Guzman v. Gracia*, **346 F.3d 229, 243 (1st Cir. 2003)**, when it subjected a Puerto Rico notarization requirement to strict scrutiny because that restriction required every voter signature to be notarized in a state where only lawyers could be notaries.  The Eastern District of Pennsylvania ruled similarly in *Green Party of Pa. v. Aichele*, **89 F. Supp. 3d 723, 744-45 (E.D. Pa. 2015)**, when it determined that a Pennsylvania law requiring every signature page to be notarized caused a severe burden as applied to the named plaintiffs, as the cost to those plaintiffs to obtain notarizations made it nearly impossible for them to get on a ballot.

The issue, then, is whether the Illinois notarization requirement, coupled with the other Illinois ballot restrictions, imposed a severe burden on the Green Party, their candidates, and their supporters.  The plaintiffs bear the initial burden to show a severe burden, ***Washington State Republican Party v. Washington State Grange*, 676 F.3d 784, 791 n.4 (9th Cir. 2012)**, and the evidence they've offered falls short of showing one here. The plaintiffs reference the hassle for circulators to get a number of signature sheets notarized, but most of the evidence they've offered on that point is rather non-specific,[2] and in any event that hassle has been reduced by a number of mitigating circumstances. For one, the Illinois notarization requirement permitted Tripp and Shephard to submit as many signatures on one sheet as they could fit and get that entire sheet notarized. Illinois didn't limit the number of signatures per page or require each signature to be notarized, and that reduces the burden a bit.  Lessening the burden even further was the fact that both candidates' ran in districts with a city that had a free notary service, a common service in most communities around the United States and a method that Tripp and Shephard essentially concede was available to them and others like them (they "assume," for purposes of laying out the burden, that some notary services are "free").  Finally, the Green Party was able to throw notarization gatherings to assist circulators in getting sheets notarized, the Green Party Chairman was himself a notary, and other circulators could become notaries to ease things.  The plaintiffs balk at that

---

[2] Smart insists that much of the plaintiffs' evidence offered to show a severe burden as to the notarization requirement and the other Illinois regulations is inadmissible, for the statements aren't based on personal knowledge, are inadmissible hearsay, or constitute unsupported conclusions.  The Court needn't take those challenges up—assuming the plaintiffs' evidence is admissible, it still doesn't demonstrate a severe burden.

last option given the hassle and cost, but the time and expense to become a notary in Illinois is not extreme, as is the case for most states.  *See Perez-Guzman*, 346 F.3d at 240 **("In most jurisdictions, it is neither impractical nor burdensome for party members to become notaries so that they may verify the petitions that they circulate.").**

The plaintiffs compare the burdens here to the burdens that were viewed as severe in *Perez-Guzman*, **346 F.3d at 238-40**, and *Aichele*, **89 F. Supp. 3d at  744-45**, but those cases don't help the plaintiffs as much as they'd like.  The Illinois notarization requirement pales in comparison to the one held to cause a severe burden in *Perez*—unlike *Perez,* there doesn't seem to be any major limitations on who can become a notary in Illinois, and Illinois doesn't require each signature on a sheet to be notarized in the signor's presence.  The Pennsylvania requirement in *Aichele* is closer to the one at issue in this case, but that case involved a mandatory fee per notarization not present in Illinois, and the plaintiffs in *Aichele* offered proof that, considering the notary fee and other aspects of Pennsylvania's notarization process, the notarization requirement imposed such significant costs as to functionally exclude them from the ballot.  As the Court said above, the evidence offered in this case doesn't show that the notarization requirement imposed that kind of burden, either on its own or taken in combination with Illinois' other regulations.  The plaintiffs go so far as to imply as much in their briefing, conceding that the burden imposed by notarization "can be debated."

It's critical to remember that ballot regulations only impose severe burdens when they operate to freeze out reasonably diligent candidates—if other groups or individuals subject to similar burdens have been able to clear them, their success

14

suggests a lack of any significant hindrance.  *See, e.g., **Stone**, 750 F.3d at 678 (fact that nine candidates satisfied the regulation was "powerful evidence" that the burden was "not severe"); **Lee**, 463 F.3d at 769 (evidence that "not a single independent" candidate qualified suggested that the burden was severe); **Rednour**, 108 F.3d at 775 (evidence that two third-party candidates cleared the requirement suggested that the requirements didn't "pose an insurmountable obstacle").*  Under that lens, there's been no systemic freeze out in Illinois, for a number of individuals or parties faced with the same restrictions have been able to secure a place on their respective ballots.  In 2012, Paula Bradshaw successfully petitioned to have her name placed on the ballot as a Green Party candidate for the 12th Congressional District of Illinois; the Green Party was unestablished at the time, and consistent with Illinois requirements, Bradshaw submitted 571 notarized sheets containing up to ten signatures per sheet.  In the same year, John Hartman successfully petitioned to have his name placed on the ballot as an independent candidate for the 13th Congressional District of Illinois; independent candidates are similarly unestablished, and consistent with the Illinois statutes, Hartman submitted 821 notarized sheets containing up to ten nominating signatures per sheet.  Finally, in 2014, the Libertarian Party submitted a nominating petition for state-wide offices as an unestablished party by gathering 2,348 notarized sheets with up to twenty nominating signatures on each sheet.  These examples don't constitute proof indisputable that there is no severe burden here, but they are "powerful evidence" that the Illinois regulations impose no major hindrance, **Stone**, 750 F.3d at 683, especially given that Bradshaw and Hartman were from congressional districts with somewhat

similar characteristics as the 115th and 118th districts.  This evidence, coupled with case law and the "common-sense" considerations laid out above, lead the Court to find that Illinois' election regulations impose no severe burden.  *See id.* **at 684-85.**

Without a severe burden, a less exacting review typically applies.  The Court says "typically" because a less rigorous look might be appropriate only when the burden is not severe *and* when the challenged restrictions are facially nondiscriminatory.  ***See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (requirement that applied to "major and minor parties" alike was nondiscriminatory, despite the fact that it may, "in practice," favor established parties);** *see also Diaz v. Cobb***, 541 F. Supp. 2d 1319, 1329 n.8 (S.D. Fla. 2008) (collecting cases on the facial point).**  The only restriction that is outwardly discriminatory here is the 5% signature requirement for unestablished parties, but that difference is not the kind of invidious treatment that would trigger heightened scrutiny. The differences between established parties and unestablished ones—and for that matter between parties and independent candidates—can justify treating the groups differently, so long as the differences in treatment make sense and the different systems don't impose a substantially greater hardship on one group versus the other.  ***E.g., White*, 415 U.S. at 781-83;** *Jenness***, 403 U.S. at 441-42;** *Libertarian Party of Washington v. Munro***, 31 F.3d 759, 765 (9th Cir. 1994).**  Illinois' differing requirements for unestablished parties versus established ones clears those hurdles:  candidates from established parties in Illinois need to submit fewer signatures to be eligible for the ballot but then are forced to go through a primary to whittle down the number of people who

will appear on the ballot, while unestablished parties need to submit more signatures to show that they have a modicum of support from the electorate but then don't need to deal with the hassle of a primary process.  The difference in treatment is logical, and the requirements for unestablished parties aren't inherently more burdensome than the requirements imposed on established parties.  *See Jenness*, **403 U.S. at 441-42**,

Because Illinois' election regulations aren't invidiously discriminatory and don't impose severe burdens on the plaintiffs' rights, the challenged restrictions will be upheld as constitutional if they are "justified by relevant and legitimate state interests sufficiently weighty" to warrant the restrictions on the plaintiffs' rights.  *Crawford v. Marion Co. Election Bd.*, **553 U.S. 181, 190-91 (2008).**  The 5% signature requirement, the 90-day time period to obtain signatures, and Illinois' redistricting decisions easily pass muster.  Illinois argued in its briefing and at the summary judgment hearing that the 5% signature requirement and the 90-day period to collect those signatures together avoids overcrowding on the ballot by making sure that the ballot isn't filled to the brim with candidates who lack any real, recent support, and that the 90-day requirement is further justified by logistics needs related to the finalization of the ballot.  These requirements have served legitimate goals in the past, they continue to do so here, and Illinois' interests are weighty enough to justify the non-severe limitations on the plaintiffs' ballot rights.  *See Rednour*, **108 F.3d at 774-75 (5% requirement justified by state's need to ensure popular support);** *Stone*, **750 F.3d at 685 (12,500 signature requirement and 90-day period justified by ballot regulation concerns);** *cf. Nader*, **385 F.3d at 735-36 (suggesting that a 90-day collection period was justified in considering the**

**cumulative nature of Illinois' restrictions, despite the fact that the candidate didn't directly challenge that requirement).** In addition, mapping districts by population obviously serves a legitimate goal—with some variance, states are required to do so by other constitutional provisions. *Reynolds v. Sims*, **377 U.S. 533, 538 (1983).** Tripp and Shephard's main objection to any of these interests is that Illinois hasn't proven that its ballots have been crowded in the past so it doesn't need the 5% and 90-day requirement right now, but Illinois doesn't need to prove up that problem beforehand—it can regulate overcrowding before its ballots go to pot. *E.g., Munro v. Socialist Workers Party*, **479 U.S. 189, 194-95 (1986);** *Navarro v. Neal*, **716 F.3d 425, 431-32 (7th Cir. 2013).**

Whether Illinois' notarization requirement is justified is a closer question—this Court and a few others have cast suspicious glances at these kinds of restrictions before. That said, the Court can't say that the requirement isn't backed up by a legitimate need. Smart insists that the notarization provision is designed to ferret out circulator fraud, and the cases bear out Illinois' problems on that front—Illinois has endured fraud by roundtabling, where a group of circulators sit around a table falsely signing petitions in the name of voters to submit to election authorities, *In re Armentrout*, **457 N.E.2d 1262, 1264 (Ill. 1983)**, as well as other types of circulator fraud. *E.g., Canter v. Cook Co. Officers Electoral Bd.*, **523 N.E.2d 1299, 1302 (Ill. App. Ct. 1988);** *Huskey v. Mun. Officers Electoral Bd.*, **509 N.E.2d 555, 557 (Ill. App. Ct. 1987);** *Fortas v. Dixon*, **462 N.E.2d 615, 617 (Ill. App. Ct. 1984).** Per Smart, notarization helps to secure the "integrity" of the signature gathering process—it ensures that a circulator can be easily identified, questioned, and potentially prosecuted for perjury during the course of any

18

signature fraud investigation, a looming threat that separately helps to deter future fraud by circulators.  ***See Knobeloch v. Electrical Bd. for City of Granite City*, 788 N.E.2d 130, 132 (Ill. App. Ct. 2003); *Dunham v. Naperville Tp. Officers Electoral Bd.*, 640 N.E.2d 314, 317 (Ill. App. Ct. 1994); *cf. Schwartz v. Kinney*, 50 N.E.3d 59, 63-65 (Ill. App. Ct. 2016); *Cunningham v. Schaeflein*, 969 N.E.2d 861, 876 (Ill. App. Ct. 2012).**  The need to prosecute election fraud is a legitimate interest, ***Buckley*, 525 U.S. at 196**, and that interest can't be written off in Illinois given its robust history of election-related misconduct.  ***E.g., Griffin*, 385 F.3d at 1131; *Nader*, 385 F.3d at 734.**

Tripp and Shephard insist that the notarization requirement is unnecessary because lesser efforts could be used to get at the problem of signature fraud, but none of their proposed alternatives would capably allow for circulator prosecution.  Lesser, non-notarized verifications could still be submitted by fake circulators: those verifications can be submitted under the Illinois Code of Civil Procedure without pain of an identification check, and thus provide less of a chance for law enforcement authorities to trace down the true origin of fraud.  Binder checks by state staff, where they check signatures obtained by circulators to determine if the signatures were false, would help strike fake signatures from petitions but wouldn't help much with the prosecutorial end of things—if the circulator signs a fake name, it will be quite difficult for law enforcement to locate the circulator and ferret out the source of the fraud.

The best argument Tripp and Shephard have is that the prosecution problem could be remedied by allowing a circulator to submit a notarized verification for a group of his collected signature sheets, but even that method wouldn't protect

circulator fraud as well as a notarization on each signature sheet.  Circulators in this case, as is seemingly typical for most collection efforts, collect signature pages independently and then submit them to the candidate—the pages are then pooled by coordinators for numbering and presentment to the state.  A notarization on the last sheet in a group of sheets wouldn't safeguard fraudulent nomination petitions as effectively as a notarization on each sheet, for there would be no assurance that the sheets lacking a notarization were actually presented to a notary by that particular circulator, rather than inserted into another circulator's larger stack of sheets with a closing notarization after the fact.  In other words, a grouped system would still leave a hole for errant signature sheets to be inserted into one circulator's set of sheets, allowing the circulator who obtained a notarization of his group of sheets to claim ignorance if law enforcement arrived to inquire about a specific page of signatures.  A notarization on each page insures that the person responsible for that sheet can be questioned by authorities should any of the signatures on that page have questionable provenance.

To be sure, Tripp and Shepherd's argument about using a "grouped" method of notarization rather than per-page notarization might have more force if the burden imposed by Illinois' regulatory scheme was severe—in that case the Court would apply more exacting scrutiny, scrutiny that can often put the restrictions into jeopardy because the state is required to employ means that are carefully tailored to fit a compelling interest.  *E.g.*, *Krislov v. Rednour*, 226 F.3d 851, 859 (7th Cir. 2000); *Hall v. Simcox*, 766 F.2d 1171, 1173 (7th Cir. 1985).  The restrictions here didn't cause a severe burden, though, so the Court undertakes a "less exacting review," one that turns largely

on reasonableness and justification.  *Crawford*, 553 U.S. at 191; *Timmons*, 520 U.S. at 358.  That isn't to say that reduced scrutiny has no teeth:  if there is a lesser restriction that protects most of the state's interest than the state's decision to impose a far greater restriction could suggest a lack of reasonableness on the state's part.  *Hall*, 766 F.2d at 1173.  But this case doesn't involve the kind of far-afield restriction that would suggest that Illinois is behaving unreasonably in dealing with the problem of circulator fraud.  A "grouped" notarization approach may help Illinois hone in lawbreakers, but it wouldn't do it nearly as well as a per-page notarization, especially given the method used by many candidates to pool signature sheets collected by circulators for presentment to the state.  In all, the notarization restriction and the other Illinois restrictions targeted by the plaintiffs here are justified by the interests advanced by Illinois and those interests are weighty enough to warrant the resulting limitations on the plaintiffs' ballot access rights.  So the plaintiffs' as applied challenges must fail.

Tripp, Shepherd, their party, and their supporters also raise an as applied equal protection challenge to Illinois' restrictions.  The plaintiffs don't ably tease out this claim in their response to Smart's motion for summary judgment and don't make much effort to legally develop the claim throughout their briefing, especially the part of their claim dealing with Illinois' 2011 district mapping.  That said, the Court will do its best to address the equal protection claim despite these defects.  To the extent the plaintiffs are challenging the 5% signature requirement as discriminatory, the Court has already addressed the substance of that challenge—the different signature requirements for established parties and unestablished parties in Illinois are necessitated by the

distinctive characteristics of those groups.  *E.g., Jenness*, **403 U.S. at 440;** *Libertarian Party of Washington*, **31 F.3d at 765.**  To the extent the plaintiffs claim that other neutral requirements—namely the 90-day collection period, the notarization requirement, and Illinois' decision to remap its districts in a way that split up some of the cities in the 115th and 118th districts—caused a disparate impact on them versus established parties because of their higher signature requirements, it's doubtful that a disparate impact challenge is viable without some proof of discriminatory intent, *Washington v. Davis*, **426 U.S. 229, 248 (1976);** *Crawford*, **533 U.S. at 207 (Scalia, J., concurring)**, and the plaintiffs haven't offered a developed argument on that front here.

Even if the plaintiffs' disparate burden claim might be viable without proof of discriminatory intent, the plaintiffs' claim still fails on the merits.  The plaintiffs rely on the equal protection framework from *Jenness v. Fortson*, **403 U.S. at 440**, and *Williams v. Rhodes*, **393 U.S. at 30-31**, to back up a violation of the Fourteenth Amendment here, but those cases don't get them as far as they'd hope.  *Williams* directs the Court to consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification, and *Jenness* says that if the system applied to one group is inherently more burdensome than the system applied to the other, there may be an equal protection problem if the difference makes no sense.  For the reasons already laid out above, Illinois has advanced legitimate reasons for its system of regulations, and the burdens imposed by those regulations on the plaintiffs' rights don't rise to the level of severe.  Once more, the differing burdens imposed on established parties versus unestablished ones are

justified by Illinois' interests, particularly its need to make sure that unestablished candidates have recent, popular support before adding them to the ballot, and the system imposed on unestablished parties isn't substantially more burdensome than the system imposed on established ones, especially given that established parties must deal with a primary. *White*, **415 U.S. at 781-83;** *Jenness*, **403 U.S. at 440-41.** Given all of these considerations, the plaintiffs' as applied equal protection challenge must be rejected.

As their final claims, the plaintiffs have raised facial challenges to Illinois' restrictions, claiming that they are invalid across the board under the First Amendment and the Fourteenth Amendment. In light of the Court's conclusions above, those challenges must also fail. In most contexts, a facial challenge can succeed only "where plaintiffs can establish that no set of circumstances exists under which [the restriction] would be valid," *Fields v. Smith*, **653 F.3d 550, 557 (7th Cir. 2011)**, so the failure of an as applied challenge forecloses any facial attack. *E.g., Hightower v. City of Boston*, **693 F.3d 61, 82 (1st Cir. 2012);** *Diaz v. Paterson*, **547 F.3d 88, 101 (2d Cir. 2008);** *US Awami League, Inc. v. City of Chicago*, **110 F. Supp. 3d 887, 892 n.1 (N.D. Ill. 2015).** A facial challenge might still succeed despite the failure of an as applied challenge in the First Amendment context, but even then, the plaintiff would need to demonstrate that the statute is invalid in the majority of its applications. *E.g., New York v. Ferber*, **458 U.S. 747, 769-71 (1982);** *Voting for Am., Inc. v. Steen*, **732 F.3d 382, 386-87 (5th Cir. 2013).** In that vein, if the plaintiffs fail to "describe the instances of arguable overbreadth of the contested law," the Court is not required to employ the "strong medicine" of a facial overbreadth analysis. *Washington State Grange v. Washington State Republican*

23

*Party*, **552 U.S. 442, 450 (2008).**  Here, the plaintiffs say nothing in response to Smart's motion for summary judgment as to how the Illinois regulations are unconstitutional when applied to other circumstances, so their First Amendment facial challenge is bunk.

That covers all of the plaintiffs' constitutional claims in this case, and because they all lack merit, the defendants' motion for summary judgment must be granted and the plaintiffs' motion for summary judgment must be denied.  One closing note is in order concerning a briefing directive the Court issued prior to the July 2015 summary judgment hearing in this case.  Throughout Smart's summary judgment briefing, Smart hinted that Tripp and Shepherd's purported failure to use the entire 90-day signature collection period meant that their claims must fail—according to Smart, the candidates' lack of diligence caused their omission from the ballot, and not any onerous restriction imposed by the State of Illinois.  Given that argument, the Court directed the parties to address the res judicata or collateral estoppel effect of any ruling by the Court that relied on the candidates' diligence (or lack thereof).  The parties have taken different positions on that point, but the Court needn't resolve the issue, as the Court has not relied on the diligence point to decide this case.  To be sure, diligence has considerable relevance in the preliminary injunction context, where more flexible equitable considerations are at play, and some relevance in assessing whether the burdens imposed by a state reached the level of severe, but it has no real bearing on the causation front.  *Perez-Guzman*, **346 F.3d at 242-43.**  If there are other preclusion issues that crop up in future cases based on the Court's ruling, they will have to be addressed by the tribunals facing them at that time—the Court expresses no opinion on them now.

24

## Disposition

For the reasons stated above, the defendants' motion for summary judgment (Doc. 48) is **GRANTED**, and the plaintiffs' motion for summary judgment (Doc. 50) is **DENIED**.   This ruling disposes of all of the claims in this case, so the **CLERK** is **DIRECTED** to enter judgment in favor of defendants and against plaintiffs.

**IT IS SO ORDERED.**

**DATED:  August 17, 2016**

/s/ **Michael J. Reagan**
**Chief Judge Michael J. Reagan**
**United States District Court**